Larry **BURDETTE** (Deceased),
Appellant–Plaintiff,

v.

**PERLMAN–ROCQUE COMPANY,**
Appellee–Defendant.

No. 93A02–1007–EX–770.

Court of Appeals of Indiana.

Feb. 22, 2011.

Publication Ordered March 30, 2011.

Randal M. Klezmer, Klezmer Maudlin, P.C., Indianapolis, IN, Attorney for Appellant.

Robert F. Dolack, Travelers Staff Counsel Office, Indianapolis, IN, Attorney for Appellee.

## OPINION

BROWN, Judge.

An application for adjustment of claim was filed with the Indiana Worker's Compensation Board (the "Board") in the name of Larry Burdette, deceased, against his employer, Perlman–Rocque Company ("Perlman").[1] The full Board affirmed the single hearing member's denial of Burdette's claim. The restated issue on appeal is whether the Board erred in so doing. We affirm.

The relevant facts follow. Burdette was employed by Perlman for over eighteen years as a maintenance man. On May 31, 2006, sixty-two year old Burdette was working on a mechanism for a door to a freezer located in a Perlman warehouse facility. At some point Burdette fell and hit his head and was later found unconscious and unresponsive by co-workers. Burdette was taken to the hospital and died on June 8, 2006.

On November 27, 2006, an application for adjustment of claim was filed on Burdette's behalf alleging that he "hit his head, while inside a freezer/cooler, causing a fractured skull which led to a coma" and that he "never recovered and died on June

---

1. The application for adjustment of claim identified Nonia Burdette as the wholly dependent wife of Larry Burdette.

8, 2006." Appellant's Supplemental Appendix at 1. On September 24, 2009, a hearing was held before a single hearing member. The parties stipulated that Burdette was an employee of Perlman, that on May 31, 2006 he was found lying on the floor unconscious and unresponsive by his co-workers, that he was taken to the hospital and later died, and that his death was a result of head trauma sustained when he fell at work on May 31, 2006. The parties presented evidence regarding the circumstances of Burdette's injury and his prior medical history, including his medical records and the deposition testimony of several of his co-workers. The parties also filed trial briefs with the single hearing member.

On February 3, 2010, the single hearing member issued findings of fact and conclusions of law and ordered that Burdette's injury was not compensable under the Indiana Worker's Compensation Act. The single hearing member found that Burdette was found unconscious and unresponsive by co-workers, that "Burdette's co-workers that found him moved him from the spot where he actually fell before any supervisors or medical personnel arrived," and that Burdette "was standing on the floor when he fell" and "did not fall from a ladder, chair or other object of height." Appellant's Appendix at 7. The hearing member further found that there was "various hearsay evidence that ... Burdette possibly hit his head on the door jam[b] or a steel post that ran near the door to prevent forklift damage" but that "this was based on the 'guessing' of Burdette's coworkers" and that "[t]here was also no physical evidence that he hit these objects when he fell." *Id.* The hearing member found that Burdette had suffered from episodes of lightheadedness and dizziness dating back to 1991, that he was diagnosed in 1998 with "vertigo, positional, likely BPV," and that about six weeks before his fall Burdette was diagnosed

with "Meniere's vertigo." *Id.* at 8. The hearing member also found that several of Burdette's co-workers testified that he had "previously complained of problems with equilibrium, dizziness, and vertigo." *Id.* at 9. The single hearing member concluded that Burdette did not meet "his burden of proving that his accident arose out of his employment with [Perlman]," that "it is more likely than not that Burdette's personal condition caused him to fall," that "[t]he employment did not provide any increased risk which would transform [Burdette's] [f]all into a compensable accident," and that "[t]he hardness of a concrete floor does not in itself increase[ ] risk, *Kovatch v. A.M. General*, 679 N.E.2d 940 (Ind.Ct.App.1997)[, *trans. denied* ]." *Id.* After a hearing, the Board issued an order on June 17, 2010 affirming and adopting the decision of the single hearing member.

■■■■ The issue is whether the Board erred when it affirmed the decision of the single hearing member denying the application for adjustment of claim. In reviewing a worker's compensation decision, an appellate court is bound by the factual determinations of the Board and may not disturb them unless the evidence is undisputed and leads inescapably to a contrary conclusion. *Christopher R. Brown, D.D.S., Inc. v. Decatur County Mem'l Hosp.,* 892 N.E.2d 642, 646 (Ind.2008). We examine the record only to determine whether there is any substantial evidence and reasonable inferences that can be drawn therefrom to support the Board's findings and conclusion. *Id.* As to the Board's interpretation of the law, an appellate court employs a deferential standard of review to the interpretation of a statute by an administrative agency charged with its enforcement in light of its expertise in the given area. *Id.* The Board will be reversed only if it incorrectly interpreted

the Worker's Compensation Act. *Id.* In evaluating the Board's decision, we will not reweigh the evidence or assess witness credibility. *Perkins v. Jayco,* 905 N.E.2d 1085, 1088 (Ind.Ct.App.2009). The claimant has the burden to prove a right to compensation under the Worker's Compensation Act. *Id.* As such, the claimant appeals from a negative judgment. *Id.* When reviewing a negative judgment, we will not disturb the Board's findings of fact unless we conclude that the evidence is undisputed and leads inescapably to a contrary result, considering only the evidence that tends to support the Board's determination together with any uncontradicted adverse evidence. *Id.*

■ Burdette's argument is that he suffered a work-related fall by slipping or tripping on the concrete floor. Specifically, Burdette argues the Board was "merely speculating that Burdette's 'personal condition caused him to fall,' yet there is no conclusive medical evidence in the record, based on objective medical testing, to indicate that Burdette did indeed suffer from Meniere's Vertigo or some other condition that would cause him to involuntarily fall at work...." Appellant's Brief at 14. Burdette argues that "[t]here is no evidence in the record that Burdette fell, anywhere, during the last six weeks of his life, or that he had any personal imbalance issues" and that "[i]n fact, the evidence ... indicates that May 31, 2006, was just a normal day for Burdette...." *Id.* at 15. Burdette argues that the floor in the "area where Burdette was working was concrete, and had no protective mats to keep him from slipping on the cool concrete floor." *Id.* at 16.

Burdette further argues that his employment placed him in working conditions that increased the effects of his fall. He asserts that Perlman sent "him to repair the cooler/freezer door on May 31, 2006, in an area surrounded by metal railings and poles, both strong enough to protect the doors and perishable goods from fork lift machines, [and] increased the effects of his fall such that when he hit one of these hard surfaces, it caused ... a skull fracture...." *Id.* at 17. Burdette points to the testimony and the accident report prepared by John Barker, the warehouse manager at the time, which indicated Burdette fell and "hit lower inside part of the doorway after [ ] fall." *Id.* at 19 (citation omitted). In his statement of the facts, Burdette also points to the accident report prepared by Barker indicating that Burdette "fell into door jam[b] hitting back of head." *Id.* at 5 (citation omitted). Burdette argues that, whether he climbed metal rails to inspect the top of the freezer doors or had been standing on the concrete before his fall, he would have come into contact with a pole or metal rail before hitting the ground increasing the dangerous effects of his fall. Burdette further points to the deposition testimony of his former co-worker Douglas Swatts who testified that when he arrived on the scene he learned from the people carrying Burdette that he had hit his head on the railing.

Perlman argues that the cause of Burdette's fall was his personal condition. Perlman argues that it presented substantial evidence establishing the cause of Burdette's fall as "Meniere's Disease/vertigo." Appellee's Brief at 11. Perlman further argues that no dangerous condition existed where Burdette fell. Specifically, Perlman argues that "the Board correctly determined that Burdette landed on the concrete floor and did not hit his head on anything else when he fell." *Id.* at 15. Perlman also argues that "[n]either a concrete floor nor a door jamb constitute a dangerous condition" and that Burdette failed "in his burden of proof as there is no evidence the door jamb was out-of-the-ordinary, or even that it was ordinary and was inherently dangerous." *Id.* at 17.

In his reply brief, Burdette argues that he "never had a physician objectively test that he, in fact suffered from Meniere's Disease" and that "to find that Burdette likely fell due to some idiopathic condition is simply wrong" and "[t]o come to this conclusion the [Board] had to assume facts that are not in the record." Appellant's Reply Brief at 2, 4. Burdette also argues his place of employment increased his risk of injury, that he "was working next to metal rail and metal poles," and that "[s]uch metal rails are not customarily found in a non-work environment...." *Id.* at 4–5.

■ The Indiana Worker's Compensation Act provides for compensation of injury or death by accident arising out of and in the course of employment. Ind.Code § 22–3–2–2; *Wright Tree Service v. Hernandez,* 907 N.E.2d 183, 186 (Ind.Ct.App. 2009), *trans. denied.* The claimant bears the burden of proving the right to compensation. *Perkins,* 905 N.E.2d at 1088; *Wright Tree Service,* 907 N.E.2d at 186. As a general rule, "the issue of whether an employee's injury or death arose out of and in the course of his or her employment is a question of fact to be determined by the Board." *Wright Tree Service,* 907 N.E.2d at 186–187.

■ "To 'arise out of' employment and therefore be compensable, there must be a causal connection between the injury and the worker's employment." *Global Const., Inc. v. March,* 813 N.E.2d 1163, 1168 (Ind.2004) (citing *Milledge v. The Oaks,* 784 N.E.2d 926, 929 (Ind.2003), *superceded in part on other grounds* ). The "nexus is established when a reasonably prudent person considers the injury to be born out of a risk incidental to the employment, or when the facts indicate a connection between the injury and the circumstances under which the employment occurs." *Milledge,* 784 N.E.2d at 929 (cit-

ing *Wine–Settergren v. Lamey,* 716 N.E.2d 381, 389 (Ind.1999)).

■ The risks incidental to employment fall into three categories: (1) risks distinctly associated with employment, (2) risks personal to the claimant, and (3) risks of neither distinctly employment nor distinctly personal in character. *Id.* at 930. "Risks that fall within categories numbered one and three are generally covered under the Indiana Worker's Compensation Act." *Id.* However risks personal to the claimant, those "caused by a pre-existing illness or condition unrelated to employment," are not compensable. *Id.* (citing *Kovatch v. A.M. Gen.,* 679 N.E.2d 940, 943 (Ind.Ct.App.1997), *trans. denied* ). With respect to injuries resulting from workplace falls in particular, the Indiana Supreme Court and this court have noted:

> Workplace falls can result from either an employment, personal or neutral risk, or from a combination thereof. Some falls clearly result from risks personal to the employee; that is, they are caused by a pre-existing illness or condition, unrelated to employment. As a general matter, these "idiopathic" falls are not compensable. In contrast, some falls are "unexplained" in that there is no indication of causation. Most jurisdictions compensate such falls, classifying them as neutral risks.

*Id.* at 931 (citing *Kovatch,* 679 N.E.2d at 943 (citations omitted)). We have noted that very few falls are truly "unexplained" and that "[a]s long as the evidence supports a reasonable inference that the fall was the result of a personal or idiopathic condition, the fall should not be categorized as unexplained." *Kovatch,* 679 N.E.2d at 943 n. 4.

Further, we have previously stated that a "more difficult analytical situation arises when the employment itself increases or contributes to the harm or risk suffered by

an employee in an idiopathic fall." *Id.* "An increased risk can occur in one of two ways: [The] employment contribution may be found either in placing the employee in a position which aggravates the effects of a fall due to the idiopathic condition, or in precipitating the effects of the condition by strain or trauma." *Id.* at 943 n. 5 (citing 1 Arthur Larson, THE LAW OF WORKER'S COMPENSATION, § 12.00 at 3–416 (1996)). "[T]he effects of such a fall are compensable if the employment places the employee in a position increasing the dangerous effects of such a fall, such as on a height, near machinery or sharp corners, or in a moving vehicle." *Id.* at 943–944 (citing Larson, *supra* § 12.00 at 3–416–426). As noted in *Kovatch,* the Indiana Supreme Court has affirmed the Board's denial of compensation to an employee for injuries that he sustained as a result of an idiopathic fall onto a concrete floor. *Id.* at 946 (citing *Pollock v. Studebaker Corp.,* 230 Ind. 622, 623–624, 105 N.E.2d 513, 513–514 (1952)).

In the present case, the single hearing member and Board found that Burdette's fall was caused by a personal condition and that Burdette's employment did not provide any increased risk. The evidence presented at the September 24, 2009 hearing included the deposition testimony of several of Burdette's former co-workers and his medical records.

Burdette's former co-worker Barker, who was a warehouse manager at the time of Burdette's fall, testified that one the supervisors from the warehouse called him and said: "[Burdette's] down. We don't know what's going on. We don't know what happened." Transcript of Exhibits at 210. When asked about his "first instinct" upon hearing that Burdette was down, Barker testified that Burdette had told him that he had been having "[e]quilibrium" issues. *Id.* Barker testified that he had "many conversations with [Burdette] prior to" the incident and that he

was "very close with" Burdette. *Id.* at 216. Barker testified that he "was discussing this issue with [Burdette] almost daily, so I knew what was going on because there was a concern . . . ." *Id.*

Barker further testified that no one knew for certain exactly what happened and stated: "I mean one minute he was standing near the cooler/freezer door . . . . He was standing there in the little hallway thing that led to in between the racks, the entry, and next thing they turned around, he was laying on the floor." *Id.* at 213. When asked if he was up on a ladder at the time he fell, Barker testified: "To say he was or wasn't, no one truly knew. The only opinion of that was that he wasn't because the last person who said something to him was [a supervisor] and [Burdette] was standing on the floor. As soon as [the supervisor] turns, moments, seconds later, [Burdette] was on the floor." *Id.* at 214. Barker also testified that Burdette had a work order to fix a mechanism connected to a freezer door and, when asked about the location of the mechanism, that the mechanism was "on the left" of the door. *Id.* at 219. When asked "[h]ow high off the floor was the [mechanism]," Barker stated: "Just like you're working on a fuse box at home." *Id.* Barker also stated: "To shut off the electrical he would be to the left, but he would have to get up on a piece of equipment or something if he was working on the top part. But to say what part of the door he was working on, I don't know." *Id.* at 220. Barker also indicated that there was no sort of issue of condensation on the concrete floor near the freezer door.

We also note that, while the accident report prepared by Barker indicated that Burdette "fell into door jam[b] hitting back of head" and that the "[back] of [Burdette's] head hit lower inside part of the doorway after the fall," *see* Appellant's

Supplemental Appendix at 2, 4, Barker testified at his deposition that he meant to indicate in the report that Burdette hit his head in "[t]he opening of the doorway." *See* Transcript of Exhibits at 227. During cross-examination, Barker acknowledged that a doorjamb is not a floor but the vertical sides of a doorway. However, when asked about the language in the report "fell into door jamb" and what it meant to fall into a doorjamb, Barker indicated that to him it meant falling into the door opening space. Also, the accident report prepared by Barker indicated that no one witnessed Burdette's fall.

Burdette's former co-worker Carl Neithammer testified that he "was aware [of] and [Burdette] told [him] about his vertigo incidents." *Id.* at 81. Neithammer also indicated that he had spoken with Burdette about Burdette's vertigo between two and five times during the four years prior to Burdette's fall. Neithammer further stated that it "was an assumption" that Burdette fell because "[h]e was on the ground" and that there was no physical evidence at the scene. *Id.* at 79. Neithammer indicated that there was no condensation on the floor and that Burdette was not working on a ladder, chair, or stool at the time of his fall.

Burdette's former co-worker Swatts testified that he had previously overheard Burdette talking about vertigo and asked Burdette to explain it to him. Swatts testified that he had never noticed any condensation on the floor in and around the freezer door.

Lori Stewart, a human resource assistant at Perlman, testified that she had reviewed Burdette's absence request forms, that Burdette had recently requested a sick day, and that one sheet in Burdette's file indicated that he had asked time off for vertigo. Stewart also indicated that there was no condensation on the floor or in the area of Burdette's fall.

In addition, Perlman presented evidence of Burdette's medical records which showed that in April 1996 Burdette complained of dizziness, in December 1998 he complained of dizziness and felt "like he was going to pass out when he changed position [at] work," and in April 2006 he complained of dizziness and was diagnosed with "Meniere's Vertigo." *See* Appellee's Supplemental Appendix at 3, 6. Perlman also presented evidence regarding Meniere's disease, including that the disease is an abnormality of the inner ear which could cause a number of symptoms such as vertigo or a sudden, severe attack that causes the person to fall and which may come with little or no warning. Transcript of Exhibits at 29, 33. Further, the hospital admission information dated May 31, 2006 listed "[v]ertigo" under "past medical history" and under "history of present illness" indicated that Burdette's wife "says that [Burdette] has had some vertigo, and has had a couple falls in the past." *See id.* at 11.

The single hearing member and the Board weighed the evidence and determined that Burdette failed to prove that his injuries arose out of his employment. Evidence was presented supporting the determination that Burdette's fall was caused by a personal condition, and we cannot say that Burdette met his burden of showing that the conditions existing in the area where he fell increased his risk of falling or the dangerous effects of his fall. Given our deferential standard of review, and our review of the findings and conclusions of the single hearing member and Board and the pertinent evidence in the record, we cannot disturb the conclusion of the Board in affirming the single hearing member's determination. *See Kovatch,* 679 N.E.2d at 943 (affirming the Board's order denying the claimant compensation under the Act, noting that the claimant's medical history, together with the circum-

stances under which he was found to have fallen, justified the legitimate inference that he suffered from a pre-existing condition that caused him to fall and fracture his skull, and agreeing with the Board's conclusion that the claimant's employment did not increase his risk of harm); *see also Pavese v. Cleaning Solutions,* 894 N.E.2d 570, 578 (Ind.Ct.App.2008) (affirming the Board's decision that the claimant's injuries were not compensable under the Act because the claimant bore the burden of proof and two grounds existed for the claimant's fall on a concrete floor, one of which was a personal risk not covered by worker's compensation and one which was a neutral risk generally covered by worker's compensation).

For the foregoing reasons, the judgment of the Board is affirmed.

Affirmed.

ROBB, C.J., and RILEY, J., concur.

### ORDER

Appellee, by counsel, has filed a Motion To Publish, and having reviewed the matter, the Court FINDS AND ORDERS AS FOLLOWS:

1. Appellees' Motion to Publish is GRANTED, and this Court's opinion handed down in this cause on February 22, 2011, marked Memorandum Decision, Not for Publication, is now ORDERED PUBLISHED.

ROBB, C.J., RILEY and BROWN, JJ., concur.