**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Mar 14 2014, 9:09 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**GERALD H. McGLONE**
McGlone Law
Terre Haute, Indiana

ATTORNEYS FOR APPELLEE

Attorney for Libery Mutual Group
**PAUL L. FIELDS**
Law Offices of Liberty Mutual Group
Carmel, Indiana

Attorney for Broadspire Ins. Co.
**VAN A. NATION**
Nation Schoening Moll
Fortville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| MARY SPARKS, | ) |
| | ) |
| Appellant-Plaintiff, | ) |
| | ) |
| vs. | )   No.  93A02-1307-EX-616 |
| | ) |
| HARBORSIDE NURSING HOME,[1] | ) |
| | ) |
| Appellee-Defendant. | ) |

APPEAL FROM THE WORKER'S COMPENSATION BOARD OF INDIANA
Application Nos. C-192426 and C-192715

**March 14, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**MAY, Judge**

---

[1] Harborside Nursing Home was covered by a policy from Broadspire Insurance Company for the events resulting in Worker's Compensation claim C-195426 and by a policy from Liberty Mutual Insurance Company for the events resulting in Worker's Compensation claim C-192715.  Both agreed to defend Harborside in this action and stand in the shoes of Harborside.

Mary Sparks appeals the denial of her claims for Worker's Compensation benefits. She presents multiple issues for our review, of which we find two dispositive:

1. Whether Sparks' 2008 back surgery was causally related to the work-related injury she incurred on February 4, 2007; and

2. Whether the injury Sparks incurred on February 23, 2008, arose out of her employment at Harborside Nursing Home as to entitle her to Worker's Compensation benefits.

We affirm.

## FACTS AND PROCEDURAL HISTORY

At all times relevant to this action, Sparks was employed by Harborside Nursing Home (Harborside). On February 4, 2007, and February 23, 2008, Sparks suffered injuries while at work.

Following Sparks' fall on February 4, 2007, Sparks was taken to the hospital, received treatment, and was released to return to work on February 6, 2007. A follow-up employment physical on April 24, 2007, revealed Sparks had no continuing problems or limitations based on that incident. Sparks filed a claim for Worker's Compensation benefits, which she received for damages and treatment through June 21, 2007.

On February 23, 2008, Sparks again fell at work because her left knee gave out. She again filed for Worker's Compensation, but this time, her claim was denied because her fall was not related to her employment.

On July 16, 2008, Sparks filed an Application for Adjustment of Claim, alleging the

2

condition which prompted her upcoming back surgery was related to her fall on February 4, 2007. Her application for adjustment was denied.

Sparks appealed both the denial of coverage for her fall on February 23, 2008, and the denial of her July 16 adjustment of claim. On October 30, 2012, a single hearing member of the Worker's Compensation Board (Board) heard Sparks' appeals. On January 24, 2013, the single board member denied her appeals of both decisions. Sparks requested a hearing regarding the appeals before the full Board, and a hearing thereon was held on May 13, 2013. On June 13, the Board affirmed the denial of her appeals in an order that included the following pertinent findings:

1. On February 4, 2007 [Sparks] fell at work.
2. [Sparks] was sent to Terre Haute Regional Health Clinic and was released to return to work with no restrictions on February 6, 2007.
3. [Sparks] underwent an employment physical on April 24, 2007, at which time, there were no limitations indicated nor any problem reported for [Sparks'] back. In fact, the physical contains a reference to a remote history (1974) of a gymnastics back injury but no current problems.
4. [Sparks] visited her family doctor on occasion between February and June 2007 for a variety of minor personal health conditions, such as sinus and respiratory problems, at no time complaining as to her low[er] back.
5. [Sparks'] February 23, 2008 fall at work resulted from her left knee giving out on her without any occupational relationship whatsoever other than the fact she was at work at the time it happened. This was not a neutral risk. [Sparks] attempts to create a relationship, suggesting her left leg was injured in the fall one year earlier. The medical records from February of 2007, however, indicate no left leg injury.
6. Any medical opinion suggesting a relationship between [Sparks'] work activities and her back and left knee problems after February 2007 is based on incorrect historical information supplied by [Sparks], especially beginning February 2008. The Single Hearing Member has not identified any left leg problem diagnosed as a result of the February 4, 2007 fall at work.

3

(App. at 7.)

## DISCUSSION AND DECISION

In *Triplett v. USX Corp.*, 893 N.E.2d 1107, 1116 (Ind. Ct. App. 2008), we explained:

> When reviewing a negative judgment, we will not disturb the Board's findings of fact unless we conclude that the evidence is undisputed and leads inescapably to a contrary result, considering only the evidence that tends to support the Board's determination together with any uncontradicted adverse evidence. *Cavazos v. Midwest Gen. Metals Corp.*, 783 N.E.2d 1233, 1239 (Ind. Ct. App. 2003). The Board is not obligated to make findings demonstrating that a claimant is not entitled to benefits; rather, the Board need only determine that the claimant has failed to prove entitlement to benefits. *Outlaw v. Erbrich Products Co.*, 777 N.E.2d 14, 26 (Ind. Ct. App. 2002) (citing *Hill v. Worldmark Corp./Mid America Extrusions Corp.*, 651 N.E.2d 785, 786 (Ind. 1995)), *trans. denied* (2003). "While this court is not bound by the Board's interpretations of law, we should reverse only if the Board incorrectly interpreted the Worker's Compensation Act." *Luz v. Hart Schaffner & Marx*, 771 N.E.2d 1230, 1232 (Ind. Ct. App. 2002). "We will construe the Worker's Compensation Act liberally in favor of the employee." *Id*.

The Board's findings of fact must be sufficiently specific to enable the reader to understand the Board's reasoning and the supporting evidence it used to reach the ultimate finding of fact. *Outlaw v. Erbrich Products Co.*, 777 N.E.2d 14, 26 (Ind. Ct. App. 2002), *trans. denied.* We first review the Board's findings to determine if there is any competent evidence of probative value in the record to support them. *Triplett,* 893 N.E.2d at 1116. We then determine whether "those findings are sufficient to support the judgment." *Id*. We may not reweigh evidence or assess witness credibility.[2] *Id*.

---

[2] Sparks asks this court to use a *de novo* standard of review because "[t]he evidence in this case consists entirely of a paper record plus the testimony of Sparks." (Br. of Appellant at 11.) We decline to do so and address her appeal using the well-established standard of review for Worker's Compensation claims.

1.     February 4, 2007 Injury

The Board concluded, regarding the February 4 injury: "1. [Sparks] suffered a minor contusion and strain on February 4, 2007.  2. [Sparks] was provided with all benefits to which she was entitled flowing from said injury."  (App. at 11.) On July 31, 2008, approximately one year after she was released from treatment for the February 4, 2007, injury, Sparks had back surgery.  She claims the back surgery was "Causally Related to Her Fall on 2/4/07."  (Br. of Appellant at 11.)  We disagree.

Harborside provided evidence Sparks underwent a work-related physical on April 24, 2007, and did not complain of back pain at that time.  In addition, during that physical she reported an old back injury she sustained while participating in gymnastics in 1974.  On June 15, 2007, Sparks reported she was experiencing back spasms to Nurse Practitioner Cox at Terre Haute Regional Hospital Occupational Medicine Program and was prescribed medication therefore.  Sparks returned a week later and indicated "her back spasms are completely gone.  She has no pain.  She can do all ranges of motion without pain.  She is requesting to go back to work full duty."  (App. at 93.)  Dr. Leo Jenson reviewed Sparks' medical records and concluded, "[t]he back injury and all work related injury symptoms appeared to have completely resolved by the 6-21-07 exam. . . . She was noted to be moving normally with her gait and her ability to get on and off the exam table suggested no residual problems."  (Id. at 435.)  Finally, Dr. Neil Levine also reviewed Sparks' medical records and concluded:

> Although the examinee, on June 15, 2007, seemed to indicate that she had
> ongoing problems with her lower back, the available records do not indicate

5

that she was seen or evaluated for treatment of any low back symptoms. Therefore, it is still my opinion that the low back sprain directly resulting [from] the injury of February 4, 2007 had resolved. On June 15, 2007 the examinee did report that she had "little bit of sharp pain and numbness down both of her legs to the top of her knees". [sic] However, she was noted to have full range of motion of the lumbar spine and was able to do toe touches as well. Based upon these findings it is my opinion that the examinee's complaints at that time were more consistent with spinal stenosis and spinal claudication. In view of the fact that a subsequent MRI study dated May 2, 2008 revealed significant degenerative disc pathology involving the lower thoracic and lumbar spine from T11-12 through L3-4 with large central disc extrusions with resulting spinal stenosis which appeared chronic and long standing, and obviously predates the incident of February 4, 2007; it is my opinion that the examinee's mild presenting complaints on June 15, 2007 were related to pre-existing underlying pathology. However, at the time of her injury on February 4, 2007 she did not have complaints consistent with spinal stenosis; nor on follow up evaluation on February 6, 2007 did she have any residual complaints related to that underlying pathology. Therefore, it is my opinion that the mild complaints on June 15, 2007 were due to pre-existing pathology, multilevel degenerative disc disease with disc herniation resulting in spinal stenosis, which was mildly symptomatic at that time.

(*Id*. at 452.) Dr. Levine also reported Sparks stated "she had had [sic] a number of episodes in the past of back pain with muscle spasm." (*Id*. at 453.) Based thereon, Dr. Levine concluded, "this was just another episode as had already been documented in the past, long predating the incident in question." (*Id*.)

The evidence in the record supports the Board's findings and conclusions related to the denial of her application of adjustment for claim. Sparks' arguments to the contrary are invitations for us to reweigh the evidence or judge the credibility of witnesses, which we cannot do. *See Triplett,* 893 N.E.2d at 1116 (appellate court cannot reweigh evidence or judge the credibility of witnesses). Accordingly, we affirm the Board's decision.

6

2.    February 23, 2008 Injury

Employers are required by the Indiana Worker's Compensation Act ("IWCA") to "provide their employees with compensation for personal injuries caused by an accident arising out of and in the course of employment." *Outlaw*, 777 N.E.2d at 25. To receive worker's compensation benefits, a plaintiff must prove both elements. *Metro. Sch. Dist. v. Carter*, 803 N.E.2d 695, 697 (Ind. Ct. App. 2004). It is undisputed by the parties the February 23, 2008, injury occurred in the course of Sparks' employment because she was at work when the injury occurred. Therefore, we focus on the second element, whether the injury were "caused by an accident arising out of" Sparks' employment.

As we have explained:

"An injury arises out of employment when a causal nexus exists between the injury sustained and the duties or services performed by the injured employee." *Milledge v. The Oaks*, 784 N.E.2d 926, 929 (Ind. 2003), *superseded on other grounds* by I.C. § 23-3-2-2 (2006). The "nexus is established when a reasonably prudent person considers the injury to be born out of a risk incidental to the employment...." *Id.* (citing *Wine-Settergren v. Lamey*, 716 N.E.2d 381, 389 (Ind. 1999)).

The risks incidental to employment fall into three categories: (1) risks distinctly associated with employment, (2) risks personal to the claimant, and (3) risks neither distinctly employment nor distinctly personal in character. *Id.* at 930. "Risks that fall within categories numbered one and three are generally covered under the Indiana Worker's Compensation Act." *Id.* However, risks personal to the claimant, those "caused by a pre-existing illness or condition unrelated to employment," are not compensable. *Id.* (citing *Kovatch v. A.M. Gen.*, 679 N.E.2d 940, 943 (Ind. Ct. App. 1997), *trans. denied*). With respect to injuries resulting from workplace falls in particular, the Indiana Supreme Court and this court have noted:

Workplace falls can result from either an employment, personal[,] or neutral risk, or from a combination thereof. Some falls clearly result from risks personal to the employee; that is, they are caused by a pre-existing illness or condition, unrelated to employment. As a general matter, these "idiopathic" falls are

7

> not compensable. In contrast, some falls are "unexplained" in that there is no indication of causation. Most jurisdictions compensate such falls, classifying them as neutral risks.

> *Id*. at 931 (citing *Kovatch*, 679 N.E.2d at 943).

*A Plus Home Health Care Inc. v. Miecznikowski*, 983 N.E.2d 140, 142-43 (Ind. Ct. App. 2012), *trans. denied*. Sparks contends her injury on February 23, 2008, arose out of her employment, was related to the February 4 injury, and thus she is entitled to Worker's Compensation Benefits. We disagree.

Regarding her February 23 injury, the Board found:

5. [Sparks'] February 23, 2008 fall at work resulted from her left knee giving out on her without any occupational relationship whatsoever other than the fact she was at work at the time it happened. This was not a neutral risk. [Sparks] attempts to create a relationship, suggesting her left leg was injured in the fall one year earlier. The medical records from February of 2007, however, indicate no left leg injury.

6. Any medical opinion suggesting a relationship between [Sparks'] work activities and her back and left knee problems after February 2007 is based on incorrect historical information supplied by [Sparks], especially beginning February 2008. The Single Hearing Member has not identified any left leg problem diagnosed as a result of the February 4, 2007 fall at work.

(App. at 7.) Based on those findings, the Board concluded, "[Sparks'] February 23, 2008 fall stemmed from a personal condition and, though it occurred in the course of her employment activities, it did not arise out of those activities." (App. at 7-8.)

Harborside presented evidence that even though Sparks was physically at work at the time of her February 23 injury, the injury did not arise out of activities associated with her employment. The initial report from the Terre Haute Regional Hospital Occupational Medicine Program indicated Sparks was "Walking down the hallway of [the Harborside]

8

facility" and "Not doing anything" when the injury occurred. (*Id*. at 409.) During a

September 23, 2011, deposition, Sparks testified, regarding her injury:

Q:      Now, let's talk specifically about the incident that occurred on February
        23rd of 2008. Can you tell us in your own words what happened?
[Sparks]:      We had just finished with lunch in the dining room, taken
               patients back to their rooms. Someone called to me, and I
               stopped to answer them. As I went to turn to find out what they
               wanted, my knee just buckled. Just gave out.
Q:      What time was lunch typically?
[Sparks]:      Around noon.
Q:      So did you have anything in your hands at the time?
[Sparks]:      No, no.
Q:      Were you assisting a patient at the time?
[Sparks]:      I had been pushing a wheelchair, and I had let go and turned. It
               [Sparks' left knee] had been periodically giving me trouble, and
               you just think it's going to get better. It decided it just wasn't
               going to hold me anymore, and I went down.
Q:      Giving you trouble in what sense?
[Sparks]:      It was gradually getting weaker. Weaker and weaker.
Q:      Had you ever experienced that before where it had actually buckled on
        you?
[Sparks]:      Intermittently it would feel like it was going to go out, and a
               couple of times at home, trying to rush for the phone or
               something like that, I would take a nice nosedive. But other
               than that it was just gradually.
Q:      So you were walking down a hallway of the facility?
[Sparks]:      Yes, and unfortunately I was too far away from the handrail to
               grab it; otherwise, I wouldn't have gone down on the nice
               cement floor.
Q:      And a level floor?
[Sparks]:      Yes, sir.

(*Id*. at 371-72.)

When asked about the cause of the February 23 injury and its relation, if any, to the

February 4 injury, Dr. Leo Jansen indicated:

The back injury and all worked related injury symptoms appeared to have
completely resolved by the 6-21-07 exam. No documentation is present from

9

Dr. Patel's notes for any knee injury. She was noted to be moving normally with her gait and her ability to get on and off the exam table suggested no residual problems. The injury listed from Harborside was contusion but knee contusion was not specifically listed. Records from Terre Haute Regional hospital dated 2-4-07 states the patient complained of pain in the low back primarily but also left knee and right hip. No documentation exists for meniscus cartilage injury or sprain to the left knee. No documentation exists for meniscus cartilage injury or symptoms of a meniscus cartilage tear until 10-25-07 when she was evaluated for bilateral knee pain in her primary care physician's office. There is no good evidence in the medical record that the patient sustained a cartilage tear with the work related injury dated 2-4-07. Had a cartilage tear occurred, significant symptoms would have occurred far sooner than one year from the injury. No evidence of any knee symptoms is present in the primary care physician record until over 8 months out from the work related injury and that was for back pain and pain in both knees. The second "injury" of 2-23-08 appears not to have been an injury at all. The pop the patient felt while walking is typical of a degenerative cartilage tear. No injury is necessary for a degenerative tear to occur. The patient has a chronic sever degenerative condition of her knee which is exacerbated by her obesity. The natural progression of her degenerative condition lead to the cartilage tear, not the work related injury of [2-4-07]. Any knee injury from [2-4-07] would like have represented a knee contusion which even if present appeared to resolve by 6-21-07.

(*Id*. at 435.) Dr. Neil Levine concluded, after completing a physical exam of Sparks and reviewing her medical records:

In short it is my opinion that as a result of the incident of February 4, 2007 the examinee sustained a contusion to the left [knee] which resolved. Her injury on February 23, 2008 was not the result of the initial injury. It is also my opinion as noted above that she had long standing multi-level degenerative disc disease, multi-level herniated discs and multi-level spinal stenosis with secondary spinal claudication, long predating the incident [in] question and the incident in question did not cause her subsequent problems resulting from this pre-existing problem which ultimately lead to successful surgical intervention. However, it is my opinion that this pre-existing spinal stenosis more likely than not lead to the left knee giving way on February 23, 2008 with her resulting subsequent complaints.

(*Id*. at 453.)

10

Sparks argues her act of responding to someone calling her name was "definitely work related" and thus the injury she sustained "arose out of her employment," (Br. of Appellant at 25), but she provides no case law to support her contention. Her other arguments regarding alternate explanations for her February 23 injury that could relate back to her work duties or to the February 4, 2007, injury are invitations to reweigh the evidence and judge the credibility of witnesses, which we cannot do. *See Triplett,* 893 N.E.2d at 1116 (appellate court cannot reweigh evidence or judge the credibility of witnesses). Accordingly, we cannot reverse the decision of the Board.

## CONCLUSION

Harborside presented evidence the February 4, 2007, injury did not result in Sparks' subsequent back surgery and the February 23, 2008, injury did not arise out of the Sparks' employment with Harborside. Thus, the Board's findings were supported by evidence in the record and its conclusions of law were supported by its findings. We accordingly affirm.

Affirmed.

VAIDIK, C.J., and RILEY, J., concur.

11